## In the Matter of FELIX REIFSCHNEIDER, JR., an Attorney.

*Professional misconduct of an attorney — acts done by him while assuming to repre-sent an infant plaintiff, at the instance of the defendant in the action, which require that he submit to a reprimand.*

On an application to discipline one Reifschneider, an attorney, for professional misconduct, it appeared that an infant, by his father as guardian *ad litem,* brought an action to recover damages for personal injuries sustained by him; that after his father and the defendant had agreed on the terms of a settlement, Reifschneider was called into the case at the instance of the defendant to carry out the settlement. Reifschneider moved to procure his substitution as attorney for the plaintiff, but failed, incurring the rebuke of the court. He then obtained from the original attorneys for the plaintiff their consent to his substitution by discharging their claim for compensation with moneys furnished by the defendant, as an incident to the settlement, and thus procured his substitution. After such substitution he presented the proposed settlement to the Special Term for its sanction, without disclosing his relations with the defendant, or that the sum of $2,200, for which the settlement purported to be made, only represented the sum to be paid to the infant, and that in addition thereto $800 was to be paid to the father personally and that $1,500 was to be paid to various other persons.

It was not conclusively shown that the settlement was less favorable to the infant than if it had been conducted through another attorney.

*Held,* that as Reifschneider was a young man of but six years' standing, against whom no misconduct had previously been charged, the court would punish his offense by requiring him to appear in open court and receive a reprimand from the bench;

That the court was not limited to the punishments prescribed in section 67 of the Code of Civil Procedure, but might exercise its power under the general control founded upon Reifschneider's relation to it as an officer of the Supreme Court.

HIRSCHBERG, J., dissented on the ground that Reifschneider should be suspended.

MOTION by Foster L. Backus, special guardian of George Behr, an infant, in reference to the alleged professional misconduct of Felix Reifschneider, Jr., an attorney and counselor of the Supreme Court.

*Foster L. Backus,* special guardian, in person.

*W. N. Dykman,* for Felix Reifschneider, respondent.

*Charles A. Collin,* for Brooklyn Heights Railroad Company.

JENKS, J. :

Supplemental to the record made at Special Term, testimony was offered in our court on behalf of Mr. Reifschneider. Our conclusion justifies the action of the Special Term. In announcing it we add our words of commendation of the course of Mr. Justice DICKEY, who presided there.

Mr. Reifschneider did not demean himself well at the reference, where he had the temerity to appear without counsel, although the questions involved were serious to him. In view of adverse facts not to be gainsaid, Mr. Reifschneider, defendant and witness, without counsel, even though a lawyer, failed to elicit the mitigating features of his case as honest and able counsel could have done. Mr. Backus has discharged his unpleasant duty with ability and with perfect fairness.

These facts, we think, are established : A suggestion by the defendant brought Mr. Reifschneider into the action as plaintiff's attorney, to put through the settlement theretofore agreed upon. He moved for a substitution and failed, incurring the rebuke of the court. He then negotiated and procured the consent to his substitution by discharging the claim of the plaintiff's attorneys with a fee furnished by the defendant as an incident of the settlement. Though he may have hoped for a fee from the plaintiff, he felt assured that in any event he would receive consideration and probably compensation from the defendant outside of any sum involved in the settlement. He advised the guardian *ad litem* that the settlement was proper, and as the plaintiff's attorney he presented the proposed settlement for the sanction of the Special Term, stating that the payment proposed to be made to settle the case was $2,200, without showing that $800 in addition thereto was to be paid to the father personally, or that other and additional sums were to be paid in the adjustment. On the other hand, Mr. Reifschneider did not suggest or initiate the settlement, nor did he reduce its terms These had been determined upon by the father and guardian *ad litem* and the defendant before Mr. Reifschneider had any relation to the case or to the claims. The father testifies that when he asked Parmer to take him to another lawyer Parmer took him to Mr. Reifschneider, and that he then told Mr. Reifschneider to take the case, that the company had offered $3,000, and that he

wished to settle. John L. Wells, Esq., a counsel in the office of the attorneys for the defendant, testifies that he understood that the guardian had agreed to settle for a certain amount, which, he supposed, was $3,000, and that he understood he would settle for $3,000 before the motion was made for substitution, and that they (*i. e.*, father and son) were to have the $3,000 independent of the $750, referring by the latter sum to that paid to the plaintiff's attorneys upon their consent to the substitution. The father also deposes that he told Parmer to go to the railroad company and see if he could get more money, but, if he could not, to accept the $3,000, and that after that, he (the father) saw Mr. Reifschneider for the first time, and told him that the company had offered him a good sum of money to settle his case and his son's case, and he told Mr. Reifschneider that he wanted him " to fix the matter up." The father also deposes that after the proceedings for Mr. Reifschneider's removal and for the substitution, he again told Mr. Reifschneider that he wanted to settle all claims for the $3,000 free and clear, and asked him to get the offer in writing, which was done; that Mr. Reifschneider then asked him what witnesses he had, and the deponent told him, whereupon Mr. Reifschneider told him to talk with the witnesses and to " bring him down what they would say." They reported. Mr. Reifschneider then asked him if these were all the witnesses, and the father said they were all. Mr. Reifschneider then said he would find out what witnesses the defendant had. Thereafter, Mr. Reifschneider told him that, under the circumstances, the settlement was the wisest course. The father said that he wanted $1,000 and the boy $2,000, but Mr. Reifschneider said that he should make his claim as small as he could so that the boy could get more, and finally it was adjusted at $2,200 and $800 for the son and the father respectively. Mr. Walsh, a general investigator, also shows that Mr. Reifschneider came into the case only after the settlement had been agreed upon. After the claim of the plaintiff's attorney was satisfied and consent to a substitution was given, Mr. Reifschneider's services were required because the infancy of the plaintiff prevented a perfect settlement until it was sanctioned by the court. Mr. Wells deposes that he was told by Mr. Lyman, attorney in charge of defendant's claim department, that the father was anxious to settle the entire matter for $3,000, which the defend-

ant was willing to pay; that he was asked to talk with the plaintiff's original attorney to see if he would be willing to put through a settlement for a reasonable fee in addition to the $3,000 net for Valentine Behr and George Behr, and that on several occasions he talked with that attorney, who at first wanted $6,500 and, at the third interview, wanted to know if the company would give $4,500. Mr. Wells said that he had no authority to pay that much, but that if the attorney insisted on having the $4,500, so that he would have $1,500 after paying the $3,000 already offered to the Behrs, he would try to get authority to pay $4,500 so that the Behrs would get the $3,000. After a day or two, the plaintiff's attorney and Mr. Reifschneider came together; *the plaintiff's attorney wished to know if the company would pay the $4,500 and said he would settle the matter for that amount.* Mr. Wells told the attorney that he had not decided to make the settlement through him. The attorney and Mr. Wells agreed that in case the Behrs were to get the $3,000, the rest of the settlement, whatever it was, would be used in paying counsel fees and medical expenses, and if the attorney gave a substitution, and Mr. Wells paid him $750, the Behrs were still to get the $3,000, and the other $750 out of the $4,500 which was not paid to the attorney was to be used in paying medical bills and certain other expenses. Mr. Wells further deposes that at the time the agreement was made to pay the plaintiff's former attorney $750 for a substitution, the said attorney understood thoroughly that the railroad company was paying that amount to him because of the agreement of the railroad company to settle the Behr actions, and for the purpose of effecting a settlement by paying the sum of $3,000 in satisfaction of both the father's claim and of the boy's claim. The testimony of Mr. Wells before the referee, " Q. Did you hear or know anything about any part of the $3,000 going to the father for his share ? A. I don't know anything about that at all. Q. You never heard of that before ? No; I supposed that the $3,000 was to cover all of an outlay so far as the child, the plaintiff and his father were concerned," is not inconsistent with his affidavit, for the reason that it might well have been understood between Mr. Wells and the plaintiff's attorney that the payment of the $3,000 was to settle all claims, and

yet he might have been ignorant of any agreement that the father was to take a part thereof. That did not concern Mr. Wells or his principals so long as they obtained a settlement and releases of all claims upon payment of the lump sum.

No one criticises the conduct of the plaintiff's former attorneys, which, therefore, may be a criterion of Mr. Reifschneider's conduct, so far as the tangible result is concerned. Under the present proposed settlement, the Behrs are still to get the $3,000, and it is stated in the affidavit of Mr. Reifschneider, and not controverted, that the entire settlement embraced the payment of $4,500, namely, $750 to the former attorneys, which was paid, $350 to Parmer, $150 to the physicians and $250 to the hospital. If, then, in either event, the Behrs were to receive $3,000, the appearance of Mr. Reifschneider in the litigation did not affect the pecuniary result to the Behrs. The only possible difference, so far as they were concerned, is the proposed equation between the father and the son in case of a settlement through the former attorneys and the proposed equation under the settlement after Mr. Reifschneider was substituted. Further, Mr. Reifschneider says that he believed and still believes after his examination of the merits that the settlement was advisable. This presents an embarrassing question to this court, lest we should prejudge a case that may ultimately come before us, or even express an opinion that may affect any future settlement. While we have examined into the testimony, so far as it is disclosed by the record, I prefer to express no opinion except to say in justice to Mr. Reifschneider that the facts so far as they are indicated, do not disclose such absolute liability as to narrow the issue to a mere assessment of damages, so that it could be said that the advice approving the settlement was so bad as to justify an inference that it was dishonest. Again, when Mr. Reifschneider came into the case, he dealt not only with the guardian *ad litem*, but with a father who was a guardian *ad litem*, and who had fully made up his mind to accept a settlement which would secure the net sum of $3,000. Mr. Reifschneider neither persuaded nor importuned the father. Judge TROY, the learned referee, whom to mention is to commend, reports that the father must be absolved from the imputation of intending to betray his son, though he dilates on his comparative ignorance, and notes that his pittance of

wages, his debts for doctors and at the hospital and his large family may well have prompted his desire to settle the case. If, in addition to these cogent reasons, the father was importuned by others to settle, it does not appear that Mr. Reifschneider was one of them. The father deposes : " I had arranged the settlement with the railroad company before I had seen Mr. Reifschneider, and Mr. Reifschneider had nothing to do with the settlement therefore. Mr. Reifschneider asked me several times whether I was satisfied with the settlement, and I told him I was, and I thought it was the best thing for me and for my child to get the money, as I was afraid from what I knew of the case that if we went to trial we might get nothing. Mr. Reifschneider told me everything from beginning to end, and did everything I asked him to do. He had nothing to do with influencing me in accepting the settlement in one way or the other. All of my friends and everybody I knew and even Mrs. Pfeffer (a witness for the plaintiff) advised me to settle with the railroad company if I could get a settlement." Of course, if the same settlement could have been made through the former attorneys, the question suggests itself why was Mr. Reifschneider substituted ? Among the possible answers, two occur to me : *First*, the case had been brought to the former attorneys by Mr. Parmer, who, at the time, was in their employ under a regular salary, and who had no pecuniary interest in the result of the case. Mr. Parmer had quarrelled with his former employers, and had left them. If Mr. Parmer could oust them and could bring about a settlement thereafter, he might obtain an allowance for his services. The interest, then, of Mr. Parmer was to get the attorneys out and to get in, not Mr. Reifschneider in particular, but some lawyer other than his former employers.

It is not established then that the injection of Mr. Reifschneider into the case either changed the course of affairs so far as his clients were concerned, or was in any way detrimental to their interest, in view of the fact that a settlement had already been agreed upon, which, so far as the result to the Behrs was concerned, would, if we credit Mr. Wells' statement, have been acquiesced in and carried out by the former attorneys for the plaintiff. Aside from the payment to Mr. Parmer it cannot be said that the disposition of the proffered sum of $4,500 was improper. The infant had a suit, the

father had a claim, the attorneys for the plaintiff had a lien, and the learned referee states in his report that the father had incurred debts in connection with the sickness and injury of the child, thereby, I assume, referring to the physicians' bills and to the hospital expenses. I am not passing upon the amounts of these items, but upon the character of the claims.

The offending of Mr. Reifschneider is not in the practical result, but in his relationship. To adopt the expression of another, attorneys, "receiving their authority from the court, they are deemed its officers. Their commissions declare them entitled to confidence, and, in a just sense, their license is an assurance, not only of their competency, but of their character and title to confidence." (WOOD-RUFF, J., in *Hamilton* v. *Wright*, 37 N. Y. 502.) In view of the function that he assumed, it will not do to excuse Mr. Reifschneider on the theory that his was a nominal retainer to perfect in form a settlement fully agreed upon, for the reason that in carrying through the settlement, he had to obtain the sanction of the court. Mr. Reifschneider's fault is that he went before the Special Term as the attorney for the plaintiff. Upon the mere fact of his appearance there under such retainer, the justice presiding had a right to regard him and to rely upon him as the officer of the court, who, under oath, advised the court as to the best interests of his client, the ward of the court. It was to the interest of the child to get all that legal skill, devoted to him alone, could secure. It was to the interest of his opponent, and properly so, to pay to the child as little as possible. The question before the court was whether full justice had been done to the child, and it had a right to assume that Mr. Reifschneider advised it untrammeled by any relation whatever with the adverse party. And yet it is evident enough that Mr. Reifschneider would never have appeared in this case but for the friendly offices of the defendant, and that he knew this from the beginning. He does not pretend that his services were to be gratuitous, or that he really looked to the Behrs alone for compensation, or that his fee was to be a charge upon the $4,500. His nomination was due to the defendant, and practically he looked to that defendant alone for consideration and probably for compensation - in this very case. Under such circumstances it would seem morally impossible, no matter how high his intentions or how resolved his

purpose to consider but the interests of his client, that he could shut out from his mind and from his memory the source of his retainer and, at least, the assurance of his compensation. If, at the time he made his affidavit and moved for settlement, he believed that he had succeeded in shutting out these facts which naturally tended to tempt him, or, perhaps, any other man, to satisfy all parties, and that he was mentally isolated from all interests but those of his client, well and good; but the court, that knew nothing save that he was the plaintiff's attorney, could not weigh his sworn advice as an intellectual triumph over a kindly feeling for his client's adversary, engendered by his relations to it, but only as the submitted legal judgment of the officer of the court, who knew no friend but the plaintiff, and who had no reason to regard the interest of any other person. " An attorney," said Chief Justice HOBART, " oweth to his client fidelity, secrecy, diligence and skill, and cannot take a reward on the other side." (*Herrick* v. *Catley*, 1 Daly, 514, citing *Yardly* v. *Ellill*, Hobart, 8a; Toml. Law Dict., Attorney.) We do not attach much significance to the fact that the affidavit of one of the plaintiff's witnesses, procured at the instance of Mr. Reifschneider, was adverse to the plaintiff. It may well be that he wished to fortify himself in case the settlement were ever attacked. It does not appear that he misused it or that he proposed to do so. We do not approve of withholding all information from the court that the sum proposed to be paid to the infant was but part of the general settlement. Though it may be partly palliated by saying that the court dealt with the compensation of the infant alone, yet the court should have been informed of the full details in order that it might judge whether the infant had received his due under the full terms of the settlement. No lawyer can serve two clients any more than a man can serve two masters. In view of his relationship to the defendants, he should not have appeared as the plaintiff's attorney, advising the court upon the application made for its sanction of the settlement, or, in any event, he should not have so acted without stating his relations to all of the parties. If it be said that other justices of the court had learned of such relations, it must be answered that they did not acquire their information through him, and in view of his subsequent course I cannot ascribe his silence to inadvertence. It is not to be assumed that the knowledge of some of the justices

is the knowledge of all, or that the justices who had learned of such relations in other proceedings of the case would, without reason therefor, communicate in course the facts to Mr. Justice DICKEY.

This offense cannot be overlooked. To say the least, there is appearance of evil. We cannot hold facts as trivial which show that the attorney imposed upon the court, not perhaps by affirmative misstatement, but by his appearance and by his statements made in a relationship which, in itself, said to the court that he was retained by the plaintiff alone, in the interest of the plaintiff alone, and that in such capacity he advised the court, and, so advising, moved the court to determine the full measure of this child's redress. Mr. Collin, with chivalric sentiments, has sought to excuse, or at least to explain Mr. Reifschneider's action as the usual counterstep made necessary by the attacks of fraud and chicane under the guise of honest claims, without, however, pretending that this particular claim was dishonest. The plea that Mr. Justice DICKEY, or any other justice of the court might, have understood Mr. Reifschneider's relations to the defendant in this case, derived from knowledge of a general system or necessarily to be inferred from any facts in the procedure of this case, is not proven.

It but remains to determine the punishment which the majority of the court, after earnest and thorough deliberation, has determined upon, and which it has directed me to announce. This is not a proceeding to disbar. We are not limited to the punishments prescribed in section 67 of the Code of Civil Procedure, but our power may be exercised under the general control founded upon the relation of Mr. Reifschneider as an officer of the Supreme Court. (*Matter of H——, an Attorney*, 87 N. Y. 521.) The question is, in our judgment, not what punishment may the offense warrant, but what does it require as a penalty to the offender, as a deterrent to others, and as an indication to laymen that the courts will maintain the ethics of our profession. This offense does not require that Mr. Reifschneider should be stricken from the roll, and thereby his life be ruined; it does not require that he should meet with the terrible disgrace of suspension from practice, which in its result differs from disbarment only in the fact that it permits him after a time to return to seek a practice which he shall never find. I yield to none in my esteem for the ability and probity of our bar, but I wofully mistake

the temper of my brethren of the bar if they should deem that its welfare required either step, so drastic, against a young member of but six years' standing, against whom, until now, nothing is recorded, and who, possibly, in the keen desire to dispatch the business at hand, did not pause to realize that even though he followed a course previously agreed upon between all parties, he entered upon that course by overstepping the bounds marked by the ethics of our profession, and that, though the parties knew of his relations, the court did not. Moreover, disbarment is not for punishment so much as it is for the protection of the court. (*Rochester Bar Assn.* v. *Dorthy*, 152 N. Y. 596, 601.) Suspension is a temporary disbarment, and we feel that the court need take neither protective step. In *Bradley* v. *Fisher* (13 Wall. 335) Field, J., says : " Admission as an attorney is not obtained without years of labor and study. The office which the party thus acquires is one of value, and often becomes the source of great honor and emolument to its possessor. To most persons who enter the profession, it is the means of support to themselves and their families. To deprive one of an office of this character would often be to decree poverty to himself and destitution to his family. A removal from the bar should, therefore, never be decreed where any punishment less severe — such as reprimand, temporary suspension, or fine — would accomplish the end desired." We are of opinion that Mr. Reifschneider must appear in open court to receive a reprimand from our bench. We think that our final difference as to the punishment, marked by the dissent of Mr. Justice Hirschberg, is due after all, to different views of the severity of the punishment that the majority has voted for. We decide upon this reprimand, in the belief that it is no light thing, to be forgotten as soon as spoken, or to be regarded as but a casual criticism upon a breach of decorum. We rather believe that no lawyer, young or old, obscure or prominent, could fail either long to remember or long to regret the formal utterance of judicial censure upon his professional conduct, passed upon him standing within the bar of the court. We believe that he would feel this was a punishment not to be brushed aside because it carried neither fine nor deprivation of calling, but one to be lived down, in that it was a judicial condemnation of an act of his professional life. And yet we believe that the punishment shall not fulfill its purpose unless it may permit this

young lawyer to live beyond it into days of a useful, a successful and an honorable professional career.

All concurred (WOODWARD, J., in result), except HIRSCHBERG, J., who reads for suspension, and SEWELL, J., not sitting.

WOODWARD, J. (concurring):

I concur in the result reached by Mr. Justice JENKS, and would concur in his opinion, except that I believe the strictures contained therein against Mr. Reifschneider are more severe than the facts warrant.

HIRSCHBERG, J. (dissenting):

The majority of the court has decided that a reprimand from the presiding justice is an adequate punishment for the offense committed by Mr. Felix Reifschneider, Jr., an attorney of the Supreme Court, who is charged with professional misconduct by that court. The charges have been presented to this court by a special guardian appointed by the Supreme Court for that purpose on behalf of one George Behr, an infant, and Mr. Reifschneider having very properly been found guilty, I feel constrained to present the reasons why I deem the alleged punishment inadequate. The charges in substance accuse the respondent, Mr. Reifschneider, of malpractice and deceit, committed in an action in the Supreme Court brought by an infant by his father as guardian to recover damages from a railroad company for the results of negligence. It is charged that on the employment of the railroad company Mr. Reifschneider endeavored to oust the infant's lawyer from the case and to procure his own substitution for the sole purpose of enabling the railroad company to make a cheap settlement; that he did make an application to the court for such substitution, which, after judicial investigation, was defeated on suspicion of the collusion suggested and as not being in the honest interests of the infant plaintiff; that he then bought off the plaintiff's lawyer with money secretly furnished to him by the railroad company for that purpose and thus dishonorably procured the substitution which the court had denied; that he then applied to the court for leave to settle the action on terms agreed upon before he was substituted, and involving the payment of considerably less than the railroad company had

previously agreed to pay the attorney whom he supplanted; and that on such application for leave to settle, he suppressed and concealed many important facts and circumstances in relation to the proposed settlement, which it was necessary for the court to know in order to determine its justice and propriety. This application also resulted in a judicial investigation and condemnation of Mr. Reifschneider's conduct, the removal of the father as guardian and the substitution of a special guardian in his place, with instructions to the latter to present the charges for the consideration of this court.

In his answer to the charges the respondent denies, upon information and belief, certain allegations in the petition in which the charges are presented, to the effect that after said action was at issue the defendant, informally, made various offers of settlement to the former plaintiff's attorneys, the lowest offer being $3,000 and the highest offer being $4,500, and that the said plaintiff's attorneys offered, informally, to accept $6,000 and finally $5,500. He denies that he was employed by the defendant to make a motion to be substituted as the attorney of record for the plaintiff in the action for the purpose of accepting the defendant's offer to settle for $3,000, and denies that the motion which he concededly did make for such substitution was made in pursuance of such employment.

In demonstrating that the charges presented and tried upon this issue have been fully sustained, I will state only the undisputed facts, and will give the testimony of the witnesses chiefly in their own words, in order that there may be no possible doubt as to what the papers in the case disclose, and no doubt of the fact that Mr. Reifschneider's guilt is practically admitted.

The following are the facts: On September 30, 1899, George Behr, an infant about four years of age, received an injury which resulted in the loss of a leg, and an action was commenced to recover $30,000 damages against the Brooklyn Heights Railroad Company on October fifth following. Valentine Behr, father of the infant, was appointed his guardian *ad litem*, and Messrs. Pearsall, Kapper & Pearsall were his attorneys. The defendant answered on October twenty-fifth by Messrs. Sheehan & Collin, its attorneys. The action was placed upon the November calendar in 1899 as No.

4403, but no motion was then made for a preference for the reasons assigned by Thomas E. Pearsall, senior member of the plaintiff's attorneys' firm, that the infant was confined to the hospital until January, 1900, and that he, Mr. Pearsall, did not deem the cause in shape to try. The cause was subsequently noticed for trial at the May term in 1900, and on May seventh an order was made setting it down for trial on May 15, 1900, as preferred.

On March 31, 1900, Felix Reifschneider, Jr., gave written notice to Mr. Pearsall that he would apply at Special Term, April 9, 1900, for an order of substitution as plaintiff's attorney. This application was based on the guardian's petition and affidavit, verified March 27, 1900, before G. M. Cooper, as commissioner of deeds, and an employee in defendant's claim department, and in which petition and affidavit fault was found with Mr. Pearsall that he was delaying the trial and preventing a settlement. Other papers were subsequently submitted on the motion, among them being an affidavit of Valentine Behr, verified April 12, 1900. In opposition to this motion the plaintiff's attorneys averred by affidavit that the application was instigated by and was in the interest of the defendant with the object of securing a settlement at an inadequate sum. On the hearing of the motion Valentine Behr, G. M. Cooper and Felix Reifschneider, Jr., were examined by order of the court before William Watson as referee, and on May 15, 1900, Mr. Justice MADDOX denied the motion for substitution. The plaintiff appealed from this order to the Appellate Division. In denying the motion Mr. Justice MADDOX wrote a memorandum to the effect that there had been no unreasonable delay on the part of the plaintiff's attorneys and that the father should not be permitted to consent to a settlement of the case in the manner in which, from the papers, it appeared he sought to do. The denial of the motion was expressly based on the necessity of protecting the infant's interests and was a most positive and direct adjudication that the substitution of Mr. Reifschneider as attorney would not subserve such interests. This decision has never been reversed. Mr. Justice MADDOX wrote as follows:

" The plaintiff here is an infant and his interests are to be safeguarded, not those of the guardian *ad litem.*

" While it is true that a party has the right to change his attor-

ney upon payment of compensation due or for misconduct, or unnecessary delay, here there has been no misconduct or unreasonable delay on the attorneys' part, and I believe it to be to the infant's interest to deny the motion.

"This father should not be permitted to consent to a settlement of the case, serious as it appears to be, involving the loss of a leg, in the manner in which from the papers it appears he has sought to.

"If the guardian was the plaintiff, a different result might well be reached, but here another is solely interested as a matter of right and not of sympathy or sentiment, and he is to be protected."

On May 25, 1900, upon petition of Mr. Pearsall, verified that day, and an accompanying affidavit, together with the report of Referee Watson and the testimony taken by him, an order was granted by Mr. Justice GAYNOR requiring Valentine Behr to show cause why he should not be removed and some other person appointed guardian *ad litem* in his stead. This application was based generally upon the assertion that the guardian was in collusion with Reifschneider, with one Lewis Parmer, an employee of the plaintiff's attorneys, by whom the suit had been originally procured for them, and with the defendant for the purpose of procuring a settlement of the action at an inadequate sum. This application appears to have been reserved by the court pending the appeal from the order denying substitution, with a direction that it be submitted at "Special Term on affirmance of such order." When Mr. Reifschneider was afterwards substituted as plaintiff's attorney, the appeal and the motion to remove the guardian were discontinued.

In the matter of these motions and the appeal Mr. Reifschneider appeared nominally as the attorney for the plaintiff, the guardian, and in his testimony before Referee Watson thwarted, so far as he was able to do so, all efforts to establish that he was acting as an attorney for the defendant. In the proceedings now before the court, however, with the exception of the denial contained in his answer, it seems to be practically admitted that he was all the time acting under the defendant's retainer, in its interest and employment, and in the reasonable expectation of receiving its pay; and that the suspicion of collusion and unfairness urged upon the attention of the Special Term was, therefore, fully justified.

As this investigation necessarily involves Mr. Reifschneider's

truthfulness as a desirable quality in an upright attorney when deal-
ing with the court, and especially when under oath, a single extract
from his evidence may prove illustrative. Stress had not only been
laid upon the fact of the verification of Mr. Reifschneider's motion
papers before Mr. Cooper, a man well known to be employed in the
railroad company's claim department, but also upon the fact that
Mr. Reifschneider had on other occasions attempted to be substi-
tuted as attorney for infant plaintiffs on the defendant's retainer.
Indeed, in his answer to these charges, he says : " It is true that I
have acted in other cases for plaintiffs, and received my pay from
the Brooklyn Heights Railroad Company, defendant." While
under oath before Referee Watson, however, he swore as follows:
" Q. To whom did you give the original paper in this proceeding to
have executed ? A. There were two gentlemen present. I am
pretty positive that I gave it to Mr. Cooper. Q. Who is Mr.
Cooper ? A. Commissioner of Deeds. Q. In whose employ is he ?
A. *I don't know positively.* Q. To your best knowledge in whose
employ is he ? A. *I could not say.* Q. Are you able to state that
you do *not* know in whose employ he was at the time you gave him
this paper ? A. *I could not say* positively in whose employ he was.
Q. Can you state at all as to whose employ he was in at that time ?
A. *I would not care to say.* Q. Have you any knowledge or
opinion of any kind that would lead you to believe in whose employ
he was at the time you gave him the paper to get executed in this
proceeding ? A. I think, as near as I can say, that he had *some
connection* with the railroad company. Q. The Brooklyn Heights
Railroad Company, the defendant in this suit ? A. *I could not
say.* Q. Do you mean the Brooklyn Heights Railroad Company ?
A. *No, I do not mean the Brooklyn Heights Railroad Company.*
Q. What railroad company did you mean when you said ' railroad
company ? ' A. When I said ' railroad company ' then I meant the
Brooklyn Heights Railroad Company. Q. The defendant in this
suit ? A. *Yes, sir.* Q. Have you not been in the building in which
the offices of the Brooklyn Heights Railroad Company are situated
and seen the Mr. Cooper you referred to ? A. I have seen him in
the offices. Q. In what offices ? A. Well, *all the offices.* Q. *In
the claim department* ? A. *Yes.* Q. You have seen him in the
office of the claim department of that railroad ? A. I have seen

him in the auditor's office, in the claim department, and even in the President's rooms. I have met him in different rooms there. Q. Did you have business there at the time you met him in any of these rooms? A. *I did.* Q. Was it legal business connected with the railroad? A. No, sir, my own business. Q. What business did you have of your own with the railroad company? A. Collecting checks on cases that I have had against them — both regular checks and also sort of an order on the cashier. Q. Orders for money? A. Yes, regular checks. Q. Have you not had business with this railroad company in damage suits that have been sent to you by some officer or lawyer or employee of the Brooklyn Heights Railroad Company? A. I decline to answer that on the ground that it is immaterial, irrelevant and incompetent. [Referee rules that the question is proper and that it is material and relevant to the issue.] *Question repeated.* A. *I have had one or two cases sent to me.* Q. By whom were they sent to you? A. I cannot answer that question in that form. Q. Do you know who sent you the cases? A. *Yes.* Q. Who did send them to you? A. Different people. *By the Referee*: Q. Name anybody connected with the Brooklyn Heights Railroad Company who has sent you a case? A. *Nobody.*"

The effort of Mr. Reifschneider to obtain his substitution as plaintiff's attorney openly and with the sanction of the court having failed, resort was now had by him to negotiation, and after some discussion the plaintiff's attorneys agreed to retire from the case, and to consent to the substitution of Mr. Reifschneider, on payment to them of the sum of $750. The defendant gave to Mr. Reifschneider a check for that amount, which he caused to be deposited in the bank in his wife's name, and her check was used by him in settling with the plaintiff's attorneys. Up to this time the plaintiff's attorneys had made a gallant fight for their poor and helpless client and only yielded when as will be seen they were driven out by corruption, bribery, treachery and deceit. After the railroad company had thus settled with the plaintiff's attorneys and gotten them out of the way, Mr. Reifschneider was substituted as plaintiff's attorney, and shortly thereafter he applied to the court at Special Term for an order authorizing the settlement of the case on payment by the defendant of the sum of $2,200. It is now undis-

SECOND DEPARTMENT, APRIL TERM, 1901.        [Vol. 60.

puted that the defendant had previously offered to pay Mr. Pearsall's firm $4,500 in settlement of the case, which offer Mr. Pearsall had refused as insufficient. Thereafter, and pending the legal proceedings and negotiations herein recited, Mr. Pearsall endeavored to procure a settlement on the basis of $4,500, but the defendant refused to renew the offer or to settle for that amount. The possibility of Mr. Reifschneider's successful intervention had come into the case, and Mr. Pearsall was told that that offer was "off." On the application by Mr. Reifschneider to the court for leave to settle for the sum of $2,200, there appear to have been presented a petition and an affidavit made by Valentine Behr and an affidavit of Mr. Reifschneider, all verified on the — day of June, 1900. Accompanying them is an offer on the part of the defendant, dated and verified June 11, 1900, to the effect that the defendant "offers and agrees to pay Two Thousand Two Hundred dollars (2,200) in full settlement of the infant plaintiff's claim and cause of action herein, and consents that judgment for said amount be entered herein." In Mr. Reifschneider's affidavit he states : " I have examined into the circumstances of the case and have, to the best of my ability, made myself familiar with all the facts, and have taken all the steps necessary for the protection of the rights of the said infant. I am acquainted with the offer of judgment made by the Brooklyn Heights Railroad Company, the defendant, and I verily believe, from an examination of the facts, that the best interests of the infant will be served by accepting the offer of judgment made by the defendant, and I have advised the guardian *ad litem* of the infant plaintiff to accept the offer of two thousand two hundred dollars." In Valentine Behr's petition for leave to settle, he states " that your petitioner has inquired into the facts and circumstances of the injuries, and has counseled with Felix Reifschneider, Jr., his attorney, in reference to said suit, and made him acquainted with the offer of the said defendant. That the said Felix Reifschneider, Jr., has advised your petitioner that, under the facts and circumstances herein, it is doubtful whether a recovery could be had if said suit were brought to trial. That the offer of the said defendant is ample compensation for the injuries and damage sustained and to infant plaintiff's advantage, and he advises the acceptance of said offer. That, from your petitioner's examination and inquiry into

the matter, he believes that the acceptance of the said offer will be
to the infant plaintiff's advantage, and that it is full compensation
for any injury or damage which the said infant has sustained." In
the affidavit of Valentine Behr he states: "That I am advised by
my attorney herein that there are questions of law and fact involved
which would render the outcome of the action commenced doubtful,
and I, therefore, believe that it would be to the best interests of the
said infant that the said offer of two thousand two hundred dollars
be accepted. That I have made myself acquainted, to the best of
my ability, with the rights of the said infant, and I have taken the
necessary steps to protect his said rights, and I believe an acceptance
of the said offer will be ample compensation for the injuries the
infant plaintiff has sustained."

On the hearing of the application for leave to settle, Mr. Justice
DICKEY ordered a reference to James Troy, Esq., to take testimony
and report to the court whether the guardian *ad litem* and his attor-
ney in advising the acceptance of the offer of settlement were act-
ing in the best interest of the plaintiff. In the meantime Mr. Fos-
ter L. Backus was designated as special guardian of the infant
plaintiff. Hearings were had before the referee on June nineteenth,
twentieth and twenty-first. On these hearings Felix Reifschneider,
Jr., Valentine Behr, Thomas E. Pearsall, John L. Wells, an attor-
ney in defendant's employ, and John Walsh, Jr., general investi-
gator in defendant's claim department, were examined as witnesses.
Upon such testimony the referee, Troy, made his written report to
the court, dated June 29, 1900, advising against the allowance of
the proposed settlement as not in the interest of the plaintiff.
Thereupon the court at Special Term refused to sanction the settle-
ment, branding Mr. Reifschneider's conduct as the "betrayal of
trust of the interests of a helpless child," and directed Mr. Backus
to bring the conduct of Mr. Reifschneider to the attention of the
Appellate Division "for such action as they may deem proper."

It appears from the papers and testimony in the case that from
the outset a persistent effort has been made by the defendant to set-
tle this case, and that Mr. Pearsall's firm was willing to settle, but
demanded more than the defendant was then willing to pay. The
lowest offer the defendant made was $3,000, and its highest offer
$4,500. The plaintiff's attorneys first asked $6,000, but came down

SECOND DEPARTMENT, APRIL TERM, 1901. [Vol. 60.

to $5,500. Possibly influenced by the motion first herein recited, and by the exhibition of Valentine Behr's dissatisfaction with the conduct of the case, Mr. Pearsall finally agreed to take the sum of $4,500 which the defendant had offered, but the defendant then, as has been said, refused to keep that offer good. The dissatisfaction of the guardian with Mr. Pearsall's conduct of the case does not appear to have any satisfactory basis, but was both created and fomented by Parmer, who having originally brought the case to Mr. Pearsall's firm, subsequently appears to have been bribed by the promise of a share in the infant's claim to influence the guardian against his attorneys, and to have connived with both the respondent and the defendant to bring about the substitution and the settlement. The defendant has agreed to reward him for his treachery by the payment to him of $350 from the infant's money. On the hearing before Referee Troy there was hardly a pretense but that the scheme to oust Mr. Pearsall and to substitute Mr. Reifschneider either originated with or was actively aided by the defendant, and that its sole object was to enable the defendant to settle the suit for the sum of $3,000 instead of $4,500. Mr. Wells indeed testified that nobody connected with the defendant or himself, or any member of his firm had directly or indirectly engaged the services of Mr. Reifschneider, and that, so far as he knew, Mr. Reifschneider was not acting for or on behalf of the company in attempting to get rid of Mr. Pearsall. He (Wells) had, however, negotiated with Mr. Pearsall in reference to a settlement, and admitted that his impression was that he had told Mr. Pearsall that $4,500 was his limit. In reference to the proposed settlement through Mr. Reifschneider he testified that he had said $750 would be right for Mr. Pearsall. He was asked : " Q. You said you thought $750 would be a fair proportion for him ? A. Yes. Q. What proportion did you have reference to ? A. The ordinary percentage in this case of one-third. Q. So that was the percentage you had in mind when you said $750 would be his proportion ? A. Yes. Q. Now, did you know that there was a check to be given for that amount ? A. I did not; I had recommended that that amount be paid. Q. Did you recommend that amount to be paid without any other arrangement as to settlement with company to pay out $750; you had no arrangement of any kind as to the settlement of the case ? A. I understand that the guardian had

agreed to settle for a certain amount. Q. I think that covers my question. Do you remember what that amount was? A. *I understand it was $3,000.* Q. That was before the motion was made for substitution? A. I understood that he would *settle for $3,000 before the motion was made for substitution.* Q. Did you understand that the company were to give a check for that $750 without having any assurance except the mere understanding with the guardian that they would be absolved? A. That is the understanding I had of it, that the guardian had made an affidavit, or written offer or something, and that the claim department were satisfied. Q. Whatever took place the claim department were satisfied? A. Yes, they were satisfied. Q. And on that satisfaction they gave this check? A. Yes; of course there could not be any other guarantee. Q. Was that $3,000 did you understand in addition to the $750, or was the $750 to be paid over it? A. That was not considered to have anything to do with it at all. Q. That $750 was *simply to get rid of Mr. Pearsall,* and they were to have *$3,000 independent of that?* A. Yes. * * * Q. Did you hear or know anything about any part of the $3,000 going to the father for his share? A. I don't know anything about that at all. Q. You never heard of that before? A. No, I suppose that the *$3,000 was to cover all of our outlay,* so far as the child, the plaintiff, and his father were concerned. Q. Nothing said about the father getting any portion of it that you know of or remember? A. I don't remember any statement about that one way or the other. Q. Mr. Reifschneider has said in answer to some questions put to him that before the motion was made to substitute some person in the place of Mr. Pearsall that there was an understanding that *the case was to be settled for $3,000,* and as I understand it could not be effected without getting Mr. Pearsall out of the case and that was what he was in the case for? A. *That is as I understood it.*" It is but just to Mr. Wells to add that he further testified before Referee Troy that the settlement was practically taken out of his hands; that he had nothing whatever to do with the details of it; and that he knew nothing whatever about any of the proceedings subsequent to the payment to Mr. Pearsall of the $750 and the substitution of Mr. Reifschneider as the plain-

tiff's attorney.    He did not even know that a part of the money was to be paid to the father.    He could not, therefore, now know how the money was to be divided among the beneficiaries unless as the result of information conveyed to him since the hearing before Referee Troy.    Mr. Walsh testified to a conversation with Mr. Reifschneider in the office of the defendant's claim department, as follows:    "Q. Can you tell what conversation you had, the first conversation when you said you did not know whether you spoke to him first or not?    A. I cannot say positively what conversation was had.    By the referee:    Q. Have you any recollection?    A. I think that I told Mr. Reifschneider that a settlement was about to be effected with the father of the child and that *substitution proceedings were decided upon by the company, that he was to appear.*   Q. That was within your employment for the railroad company and you had a perfect right to say that?   A. Yes.    Q. When you suggested that to Mr. Reifschneider you thought you were acting in the interest of your company?    A. Yes.    Q. What else was said?   A. I don't know of anything else.    Q. What did Mr. Reifschneider say as to that suggestion of yours?    A. If I remember correctly he said, '*All right.*' "    He further testified:    "Q. Had there been any talk between you or anybody else as to substituting Mr. Reifschneider in place of Mr. Pearsall?    A. I presume that I had been told that.    Some adjuster had agreed to a settlement and it was desired that Mr. Reifschneider take the matter up.    Q. Did you have any talk with Mr. Reifschneider after that?    A. Not that I know of, I may have had, but I don't remember.    Q. So far as you know this was the first suggestion ever made about Mr. Reifschneider on the subject?    A. Yes.    Q. Was the motion to substitute made soon after that?    A. I think so, yes, as I understood it."

Mr. Reifschneider in an affidavit presented to the Appellate Division on the motion now under consideration, and which is verified December 3, 1900, states: "The first I ever heard or knew anything about the accident to the infant George Behr, or anything about the action in the Supreme Court, in which George Behr, an infant, by Valentine Behr, his guardian *ad litem,* was the plaintiff, and the Brooklyn Heights Railroad Company was the defendant, was some time in the month of March, 1900, and to the best of my recollection, on Monday, March 26th, when one Lewis Parmer, who

was then an entire stranger to me, called at my said office and asked me if I was Mr. Reifschneider. I answered him in the affirmative. I then asked Parmer who he was and he said he was a friend of Valentine Behr, the father of the infant George Behr, and the guardian *ad litem* in an action against the railroad company, brought by Mr. Pearsall as the attorney, and that the father, Valentine Behr, was very much dissatisfied with Messrs. Pearsall, Kapper & Pearsall as the plaintiff's attorneys in that action, and that he had negotiated a settlement of the case with the railroad company, but whether the case should be settled or not Mr. Behr wanted me to act as attorney in the place of Pearsall, Kapper & Pearsall. I then told Parmer that I would have to see Valentine Behr, the father, and talk with him and find out what there was of the case. Mr. Parmer gave me Mr. Behr's address, and it was arranged that I should meet Mr. Parmer at Mr. Behr's house that evening. I went to the building in which the offices of the Brooklyn Heights Railroad Company were located to inquire about the case. I there met Mr. Walsh, who was in the employ of the railroad company as an investigator, and asked him if he knew Mr. Parmer, and if he knew anything about the Behr case. He said that the company had such a case ; that Mr. Parmer was acting for the father in arranging a settlement between the father and the railroad company and he said Mr. Parmer's statements were all right. That was the first conversation I ever had in any way with any representative of the railroad company, or any other person than Mr. Parmer, in relation to the Behr case, and is substantially the entire conversation I had with Mr. Walsh at that time." He does not say that then or at anytime Mr. Walsh told him that the company had decided upon a substitution and that he was to appear.

On the hearing before Referee Troy he testified as follows, referring to the petition prepared by him for leave to settle the case hereinbefore referred to : " Q. Had you any conversation with anybody connected as you understood with the railroad company before that petition was prepared by you ? A. What about ? Q. About the settlement of the case ? A. Yes, sir. Q. With whom did you have that conversation ? A. With Mr. Walsh. Q. What is his full name ? A. I don't know. Q. What was his relation with the railroad company ? A. He is in the claim department. Q. Had

you had any conversation with anybody else relative to the settlement of that case? A. Yes, the father and a man by the name of Parmer who brought the case to my office. Q. Anybody else? A. That is all. Q. What conversation did you have with Mr. Walsh? A. I asked what was the best they would give for the case and he told me. Q. Referring to the Behr case? A. Yes, sir. Q. What did he tell you? A. *$3,000 to cover all.* By the Referee: Q. When was that? A. *Before Mr. Pearsall objected to the substitution.* Q. As I understand it, Mr. Reifschneider, Mr. Pearsall commenced this Behr case in the first place? A. Yes, sir. Q. And the case had proceeded how far before you were introduced? A. The service of the summons and complaint. Q. It was not at issue? A. It was at issue; it came to issue the time we were dickering. Q. You were subsequently substituted? A. Yes, sir. Q. How long after you were substituted about? A. I could not say positively. Q. Had it got on the calendar? A. It was put on the calendar during the time we were dickering. Q. You subsequently became attorney in his place? A. Yes, sir. Q. That substitution occurred when you got the $750? A. Yes, sir. By Mr. Backus: Q. When were you actually substituted? A. The day that he got the check. Q. When was the conversation with Mr. Walsh which you have referred to? A. The next day I think. Q. After the substitution? A. Yes, sir; there had been some conversation there about it during the eight or nine weeks that the dickering was going on. Q. Had any offer been made to you by Mr. Walsh? A. No. Q. Was there any offer made to you by Mr. Walsh before Mr. Pearsall was substituted? A. No, sir. Q. Did you hear any conversation between Mr. Walsh and anybody else? A. No, sir. Q. Did you hear any conversation between any representative of the railroad company and anybody else before the substitution? A. Nothing excepting that which took place with Mr. Wells in Mr. Pearsall's presence. By the Referee: Q. Which you have already stated? A. Yes, sir. By Mr. Backus: Q. Did you say anything to Mr. Walsh when he told you that $3,000 was to cover all? A. What do you mean? Q. I mean what I asked you. Did you say anything to him when he said that? A. I don't understand the question exactly, Mr. Backus. Q. What did you say to Mr. Walsh when he said that $3,000 was the highest offer he would

give to cover all? A. I said, 'What do you mean by that; is that for the father's case and the infant's case?' He said, '*For the whole business.*' Q. What else? A. Well, I said, 'Is that the very best?' 'It is not worth that,' Mr. Walsh said, 'only I desire to take it out of the hands of somebody who might put in perjured testimony.' I said, '*All right,* I will see Behr about it.' Q. Was that all you said? A. I think I told him that I had been substituted. Yes, I told him that I had been substituted. Q. You told him that before he said he wanted to take it out of the hands — A. Before the formal substitution took place. I told him I had been substituted and he said, 'Is that so! Pearsall has concluded that he is licked.'"

Mr. Reifschneider further testified before Referee Troy that he was present at the conversation between Mr. Pearsall and Mr. Wells at which Mr. Pearsall asked Mr. Wells if he had not offered $4,500 to settle the case, and Mr. Wells replied that he did not remember, adding, "If I did it was some time ago, and you did not accept it and it was off; anything you want to fix you had better see Mr. Reifschneider about it." This was before his substitution. He testified in effect that he knew nothing substantially about the merits of the case until after he was substituted, when he learned from either Parmer or the guardian that the infant had no case, being informed that one of the witnesses, a Mrs. Feist, had seen the accident, and from whom he, Reifschneider, procured an affidavit written by himself, in which she swore that the motorman did everything he could to stop the car and was free from blame, or words to that effect. He stated that this affidavit and conversations with the child's father and another witness furnished the basis for his opinion that the case "had not a leg to stand on in court." It is to be noted that Mr. Reifschneider procured this affidavit without personally interviewing Mrs. Feist. He took the word of Parmer that she would swear all the blame upon the child, and without any investigation whatever hastened to have her do so. When confronted with the affidavit he was wholly unable to offer any satisfactory explanation of why he had procured it. No lawyer who has been accustomed to practice law could hesitate to believe, in the absence of explanation, that this affidavit was procured in the interest of the client who was to pay, and not in the interest of the

plaintiff. Mr. Reifschneider on the hearing before Referee Troy further testified : " Q. So that up to the time that you were looking for the substitution you supposed a good cause of action existed upon the statements of Parmer and Behr ? A. Yes, sir. Q. After you got the substitution you thought there was no cause of action ? A. No, sir; I told them to let me have the affidavits such as they had because I could not get witnesses from Pearsall. I had only Parmer and the father, and they told me how it happened. Q. Did they not tell you before they had a good cause of action ? A. No, sir, they did not. Q. Did you make no inquiries before you were substituted ? A. No, sir. Q. You did not know whether they had a good cause of action or not ? A. I did not. Q. You had no information before on the subject ? A. No. Q. The first information you got upon which you formed an opinion was three or four days after you were substituted ? A. Yes, sir." And he also testified before Referee Troy : " Q. Was it understood directly or indirectly in any way that the object of removing Mr. Pearsall was to take this offer of $3,000 ? Was the object of removing Mr. Pearsall so that *the Railroad Company's offer of $3,000 might be accepted ? A. Yes, sir. Q. That was the object ? A. Yes, sir, because Mr. Pearsall wanted $4,500.* Q. And it was also understood that if Mr. Pearsall was removed that that would be accepted, wasn't it, and this $750 was paid on account in advance ; wasn't that the understanding, or was it the understanding that if Mr. Pearsall was removed the $3,000 would be accepted, he being out of the way and the $750 was to be advanced on account of that ? A. Not on account of the $3,000, your Honor. Q. Wasn't it understood that if Mr. Pearsall was removed the $3,000 would be accepted. A. The father, had agreed to accept it, yes, sir. Q. You understood that ? A. Yes, sir. Q. So that the object then in getting Mr. Pearsall out of this case was to accept the Railroad Company's offer of $3,000 ? A. Which had been made at the time the boy was injured and had been standing ever since. Q. Didn't you understand that the payment of this $750 by the Railroad Company, given to you for the purpose of paying Mr. Pearsall, would *remove him from the case, and then the $3,000 would be accepted ? A. Yes, sir.* Q. And wasn't that $750 to be credited on the $3,000 ? A. No, sir. Q. Well, what is your answer to it ? A.

The father had agreed to take $3,000, but he insisted that he must get that free and clear, and there was some argument about that; I had some talk about it. Q. Then did you understand that the Railroad Company would have been willing to add the $750 to the $3,000 ? A. Yes, to get rid of perjured testimony as I said before. Q. To get Mr. Pearsall out of the case ? A. Yes, possibly perjured testimony; those are the words I used."

In the affidavit of December 3, 1900, he explains how the sum of $750 was agreed upon as the amount to be paid to Mr. Pearsall, and, incidentally, discloses the fact that he felt at liberty to bind the railroad company to pay that amount on his own responsibility, as follows: " A day or two afterwards, Mr. Tremaine, an attorney in the office of Pearsall, Kapper & Pearsall, called upon me and asked me if I would give one thousand dollars to the plaintiff's attorneys in satisfaction of their claim for services and disbursements, in case they would consent to my substitution. I told Mr. Tremaine that Mr. Pearsall had been offered five hundred dollars and that I had given him to understand that he might be able to get seven hundred and fifty dollars, and that to close the matter up, *I would take the responsibility of saying that he would be paid seven hundred and fifty dollars*, and Mr. Tremaine then said that they would give the substitution for that amount. I told him that I did not have the money then, but would get it. Afterward, on the same day or the next day, I went to the office of the defendant and told some representative of the company (I cannot now say just whom) that *I had agreed* to pay Messrs. Pearsall, Kapper & Pearsall seven hundred and fifty dollars in full settlement of the claims of Pearsall, Kapper & Pearsall for their services and disbursements in connection with the litigation on condition that they would consent to my substitution as plaintiff's attorney, and I was informed that I would be furnished with the seven hundred and fifty dollars at once for that purpose, in pursuance of their agreement for settlement."

In reference to his expected compensation, Mr. Reifschneider testified : " Q. Was there any understanding about your compensation ? A. Hasn't been any up to this very day, sir. Q. Then you were substantially assisting the Railroad Company in getting Pearsall out of the case; that was the result of it. A. Naturally.

\* \* \* Q. Who was to pay you? A. I hadn't had a talk with Mr. Behr about it. There was a question in my mind because he claimed that he had to pay some other expenses that had been incurred. Q. Did you look to Behr for your pay? A. I hadn't looked to anybody for it; I hadn't spoken to Parmer about it. Q. Who were you to look to for your pay? A. I was going to look to Behr for it if I could get something for\* him; if I could not I was certainly going to the Railroad Company to see if I could get anything from them. Q. But you were not their attorney? A. No, sir. Q. How could you expect anything from them? A. I kind of thought it was very unlikely. Q. You had succeeded in getting Mr. Pearsall out of the case, and you thought they ought to give you something? A. Yes, sir, something ought to be given me."

In the affidavit of Mr. Reifschneider, verified December 3, 1900, hereinbefore referred to, he states: "There never was a time when my relation to the railroad company, in my opinion, prevented my giving to my client the benefit of all my knowledge. The fact that our relation was known to Mr. Collin and approved by him, was to me a sufficient assurance of entire propriety. *I understood*, moreover, that the attorneys for the Brooklyn Heights Railroad Company had told *some of the judges of their methods* of making settlements, and had received suggestions. I had acted for plaintiffs in the manner above described a number of times, and I had reason to believe my relations with the Brooklyn Heights Railroad Company were known to bench and bar." And in the brief submitted to this court in behalf of Mr. Reifschneider, his counsel states that "his relation to the railroad company was fully set forth," on both the motion for substitution before Mr. Justice MADDOX and the motion to remove the guardian before Mr. Justice GAYNOR. It is not pretended that this relation was either disclosed or admitted *by Mr. Reifschneider*, but, on the contrary, it appears that the disclosure was in the form of an accusation made by the opposition and so far disputed by Mr. Reifschneider, either expressly or tacitly, that a reference was necessary in order to determine the fact. In respect to the concealment of the relation on the final application for leave to settle the case, the same brief candidly confesses that

---

\* *Sic.*

" If it is said he should have revealed to Mr. Justice DICKEY that he was to be paid by the defendant, I at once assent.   He should have stated every fact."

The only additional facts material to a determination of the matter are the sworn statement by Mr. Pearsall that in his opinion the infant had a good case for the recovery of compensation commensurate with his injury; that the insinuation in reference to perjured evidence is without any apparent justification, besides being in conflict with Mr. Pearsall's life and character, and that the claim is now presented on behalf of Mr. Reifschneider for the first time that the proposed settlement really but secretly contemplated the payment by the railroad company, in addition to the $2,200 for the child and the $750 already paid to Mr. Pearsall of the sum of $800 to the father of the child, $350 as a *bonus* for his mischievous treachery to Mr. Parmer, $150 to the doctors unnamed, $250 to the hospital, and whatever sum Mr. Reifschneider might charge the railroad company as a fee for his services.

It is very apparent that this claim now advanced for the first time, that in reality the railroad company has been all along anxious to expend *more money* in the settlement of the case than Mr. Pearsall demanded, is unique, and I am unable to lend it a credent ear. It is impossible that a railroad company would take all the trouble involved in this iniquitous business merely to be permitted to pay out more money in settling a case than the legitimate attorneys required.   It is unsupported by direct testimony from any source. On the contrary, as has been seen, Mr. Wells has sworn that he understood that the $3,000 settlement which the company hoped to effect by Mr. Reifschneider's substitution was to cover all the outlay, and Mr. Reifschneider not only swore that Walsh told him the $3,000 was to cover all, was " for the whole business," but that he himself understood that he was to be substituted because Mr. Pearsall wanted $4,500, and that in case of his substitution the company was to be benefited by securing a settlement for $3,000 only.   In addition to these witnesses, Valentine Behr was himself sworn on the subject before Referee Watson on April eleventh, and testified as follows:   " Q. What was the talk about the settlement of this case with the railroad company ?   A. The man who came from the

railroad company said that the railroad co. was willing to settle the case. Q. For how much money did he say the company would settle the case for? A. *$3,000*. Q. Was it not $3,500? A. *No.* Q. How much did Mr. Parmer tell you the company would settle the case for? A. *The same.* I told Mr. Parmer about that $3,000 and I said — 'well, the railroad company offered me $3,000 and Mr. Pearsall is a long time getting it.' Q. What did Mr. Parmer say to you about the settlement of the case? A. Well, he said, 'you want to settle,' and I said 'yes.' Q. What did you tell him to do then — did you tell him to go and settle it? A. I told Mr. Parmer about that $3,000, and he said that he was tired of going to Mr. Pearsall's office because he was being put off. Q. Did not Mr. Parmer say to you that he would go down to the railroad company and see if he could settle the case? A. Yes, Parmer said that he would go to the railroad office and fix it up. Q. Then did Parmer come back again to your house and tell you that he had seen the man at the railroad? A. Yes. Q. What did he say the railroad would do in the case? A. Well, he said the railroad would stick to their word; *that they would give him $3,000.*"

In view of all this positive evidence it is incredible that the railroad company ever contemplated or agreed to pay more than the sum of $3,000 to settle the case, in addition, of course, to the amount which they had paid Mr. Pearsall to get him out of the way, and the amount which they would have to pay Mr. Reifschneider for his nefarious assistance. It may be added that if the fact were otherwise, there is no law which permits the taking of the money which on a settlement belongs of right to the helpless and crippled infant plaintiff, and diverting it to the payment of doctors, nurses, hospitals, and "runners," who are not shown to have a legal claim of any kind, and to the father, as guardian, who has instituted no suit whatever, and who has accordingly no legal standing before the court for compensation.

From this statement of the facts it is very evident that the charges presented against Mr. Reifschneider have been fully made out. His conduct has been unprofessional, and has been characterized by duplicity and deceit. He has forced himself in the interest of a defendant into the position of the plaintiff's attorney in open defiance of an unreversed decision of the court, and for the purpose of oust-

ing those who were solely guarding the interests of their client, and he has done this for the purpose of effecting a settlement of the litigation on terms which the court decided should not be accepted and to which such attorneys unmolested would not have consented. Having failed to procure the desired substitution with the sanction of the court, he accomplished it finally in opposition to its mandate and by devious negotiation. Almost his only act in the case after substitution was to fasten one of the plaintiff's witnesses by affidavit to a statement which would tend to defeat the plaintiff's cause of action, and this was immediately supplemented by the presentation to the court of papers seeking authority for a settlement on a confessedly fictitious basis. The history of the case, the offers of settlement as they were actually made and met from time to time, the fact that the defendant had paid the firm of attorneys first employed in order to get rid of them, the proposition to pay a large sum of money to the guardian *ad litem* in addition to the amount offered in court, and the various other sums which it is now alleged were included in the proposed settlement, and his own dual relation to the parties to the controversy, were all suppressed by the respondent, and the matter was presented on the false claim that the sum of $2,200 was full and ample compensation for the injury complained of in the action. At no stage of the case does it appear that the respondent disclosed to the court his peculiar relation to the defendant, and even upon this motion to discipline him for his misconduct, while such relation is practically confessed by his counsel, he denies it under oath, by the denial in his verified answer that his motion for substitution was made in pursuance of his employment by the defendant. He adds: " If I am charged with keeping back my relation to the Railroad Company I answer that in almost every settlement of an infant's negligence case the attorney for the plaintiff, after settlement is agreed upon, is in the defendant's employ in just the sense and measure I was, because provision for his payment by the defendant is always made and depends upon the success of his motion for leave to settle. Whenever an attorney's affidavit is presented upon such a motion the court must assume he is an interested witness. In this case there could be no secret of my relation to the defendant, because it had been fully stated before Judge MADDOX upon my motion for

a substitution and before Judge GAYNOR upon Mr. Pearsall's motion to set aside the guardian." The specious and disingenuous nature of this answer is obvious. If the nature of his relation to the defendant was fully stated on these motions it was doubtless, as has been said, in the form of an accusation. "In both motions," he says, "my relation to the defendant was fully set forth." He does not claim that it was set forth by him or even admitted by him. If the relation was an innocent one, there is no reason suggested why it should not have been openly avowed. But two judicial investigations were made, apparently with the chief, if not the sole, purpose of ascertaining whether the relation charged in fact existed, and which investigations a frank and candid statement of the truth would have easily obviated. On the coming in of the referee's report, after the second investigation, Mr. Justice DICKEY filed a memorandum, in which he said : "The settlement is recommended by the guardian *ad litem* and his present attorney, Felix Reifschneider, Jr. In view of the fact that an offer of $4,500 was made to the former attorneys, Pearsall, Kapper and Pearsall, and refused by them as too little ; in the knowledge that the defendant furnished Attorney Reifschneider $750 to be used by him, which was used by him, to be rid of the original attorneys in the case, so that he, in the interest of the Railroad, might bring about a settlement, and finding as I do that he was in the employ of the railroad and working against the interests of his client, while to the father of the child pretending to serve the child's interests, I not only refuse to give any sanction to such betrayal of trust of the interests of a helpless child, but continue Foster L. Backus as a special guardian of the infant to take the necessary proceedings to remove the father as guardian *ad litem* and Attorney Reifschneider, so that they may no longer prove faithless to their trust. I also direct said Backus to bring to the attention of the Appellate Division the conduct of the attorney for such action as they deem proper."

The proceeding, therefore, comes to this court upon an adjudication of the Special Term adverse to the respondent, and a patient and careful consideration of the evidence compels the conclusion that the charges made against Mr. Reifschneider have been sustained.

The railroad company has voluntarily appeared in this proceeding, has been heard through its counsel, and it has filed affidavits which

have been duly considered.  It can hardly be claimed that these affidavits do more than tend to some extent to mitigate the respondent's conduct by furnishing the sanction of the defendant's attorneys for what he has done in this case, to the extent at least of establishing that where plaintiffs in accident cases desire to settle the litigation, but their attorneys refuse to consent, the payment of such attorneys by the company and the substitution of other attorneys at its expense in order to carry out such settlements receives such sanction and is in conformity with "the general system pursued by the company in effecting settlements of the accident claims of infants and representatives of deceased persons."  So far as these affidavits venture to suggest that the justices of the Supreme Court in the borough of Brooklyn, or any of them, have known or have had any reason to know of the existence of the "system," as applicable to such a case as that now under investigation, it is sufficient to say that the charge is inherently incredible, and that the papers contain no word or line of proof upon that subject.  It must be assumed that the zeal of counsel in a case where individual blame may possibly be felt is responsible for a belief which is not only without foundation in fact, but the falsity of which is strikingly attested in this very case by the forcible and effective language in which the combination between the respondent and the defendant has been condemned from the bench on each occasion when it was partially revealed by the investigations instituted at the Special Term.

Whatever consideration may be given to these affidavits in palliation of Mr. Reifschneider's offense, it is apparent that they cannot serve to furnish a justification of his conduct.  The settlement which he asked the court to permit him to carry out after he obtained the substitution is the same settlement as that which the railroad company agreed to make beforehand, when in the language of Mr. Walsh "substitution proceedings were decided on by the company," and that he, Reifschneider, "was to appear."  No one pretends but that the ultimate settlement, whatever were its terms, was the very settlement which Mr. Reifschneider's interjection into the case was designed to accomplish.  In the affidavit of Valentine Behr, verified April 12, 1900, and used by Mr. Reifschneider on the first application to the court, it is stated "that at the time that this deponent

retained Messrs. Pearsall, Kapper & Pearsall, the Brooklyn Heights Railroad Company offered this deponent the sum of three thousand dollars ($3,000) to settle his claim against it, and the Brooklyn Heights Railroad Company has ever since then often repeated the said offer. That he is informed and believes that this offer was made to Messrs. Pearsall, Kapper & Pearsall, but that the said attorneys refused to accept the same. That this deponent was then and always has been willing and anxious to accept the offer, believing that it was to the best interests of the infant to accept the same." So that when Mr. Justice MADDOX rendered his decision on Mr. Reifschneider's motion to be substituted as the plaintiff's attorney in order to carry out this proposed settlement, Mr. Reifschneider well knew that the court, whose officer he was, would neither countenance the settlement nor permit his substitution. He knew that in the opinion of the court the father should not be " permitted to consent" to the inadequate settlement proposed in a case like this, " serious as it appears to be, involving the loss of a leg." And he knew that in the opinion of the court his appearance in the case should be prohibited in order to protect the infant from the contemplated wrong, and that for that purpose it was necessary "to the infant's interest to deny the motion" which asked that he should be substituted in Mr. Pearsall's place. What Mr. Reifschneider afterwards did, with the use of the railroad company's money, and on the railroad company's retainer, was, therefore, done in bold and open defiance of the court, in callous disregard of the admonitions accompanying its decision, and for the sole purpose of effecting that disposition of the case which had been judicially condemned as a violation of the infant's rights and a betrayal of its interests, and surely his conduct cannot now be justified by the suggestion that he could possibly have supposed that his course was, or would be, approved by the court or by any of its justices.

I have written at an unusual length in order that there may be no reasonable doubt as to the precise nature and extent of Mr. Reifschneider's offense and as to the inadequacy of the proposed punishment. He has been found guilty by the court below, and he has been found guilty in this court. He is to be reprimanded by the presiding justice of this court for something which he has done or

omitted to do in the premises. The majority of the court, however, believe that it is something which would be sufficiently punished by a reprimand. If it is, as it seems to be practically conceded upon the undisputed facts that it is, the prostitution of his profession to the serious deprivation of the rights and interests of a crippled client, accompanied by a constant and cunning suppression and concealment from the court of damaging facts in relation to the proposed misappropriation of funds properly belonging to the infant, and in relation to his own connection with the defendant, all studiously concealed from the court in the hope of procuring a judicial sanction of his course which he knew could not have been otherwise obtained, and in the hope and expectation of receiving pay from the ostensibly opposing litigant, he has committed an act which cannot be expiated by submission to a reprimand. The authority of this court to act in the premises is contained in section 67 of the Code of Civil Procedure. It provides that "an attorney and counselor who is guilty of any deceit, malpractice, crime or misdemeanor, * * * may be suspended from practice, or removed from office, by the appellate division of the supreme court." No middle course is permitted under the law. The standard of honor among the members of the bar is high, and has been so maintained by the natural and instinctive probity and purity of the profession, and it should never be lowered by the action of the court. If a counselor refuses to sit down when told to do so by the court, or uses intemperate language, the occasion might justly admit of a rebuke or reprimand. But the framers of the law never meant that deliberate and persistent professional misconduct should be punished by a mere reprimand from the bench.

I can only, however, register my protest against the proposed action, and vote for such a period of suspension as will fairly mark this court's sense of disapprobation of an attorney's disreputable conduct.

Mr. Reifschneider is ordered to appear before this court on April twenty-fourth instant, at one o'clock in the afternoon.